And it's number 241363. And I think with that, we can begin that argument. As I understand it, is it Ms. Clark who has the appellant or do I have that wrong? That's correct, Your Honor. Okay. On screen, they don't have, I think they don't have your name quite right, unless... This is always an issue. Professionally, I go by my maiden name, Robin Levine. Oh, okay. By law, it's Robin Clark. And whenever I'm in federal court, this, I cause all kinds of problems with this. And if I could ask you just one moment, because the light in my office is flickering. Sure, sure. Give me just one moment. See, it's not just the lighting in my office. I was having similar issues earlier this morning. Okay. You have to know I'm not alone here. So, it's Robin Levin. And Robin, B-Y-N. And the reason I noticed that is that's how my wife spells her name. So, with that, let's go ahead and proceed. Thank you, Your Honor. Again, my name is Robin Levine. I represent the appellant, Brian Garrett, in this matter. And if possible, I'd like to reserve four minutes of my time at the conclusion. May it please the court, this case deals with standards for warrantless seizures, which are not based on criminal wrongdoing. It was dismissed on a Rule 12 motion, despite a number of factual disputes. Specifically, appellant Brian Garrett was taken from his home to a facility where he didn't want to be. The facility made no specific findings that he was a threat and didn't actually provide treatment. Instead, Mr. Garrett was laughed at, lied to, and threatened with extended detention and retaliation for saying that he didn't think this was constitutional. And insofar as the facility disagrees with these characterizations, that is exemplary. It is illustrative of the factual disputes here and why this matter was inappropriate for dismissal at the Rule 12 stage. What is clear and undisputed is that unlike typical seizures, which would be based on somebody making a finding that the detainee broke the law, this kind of seizure is supposedly for the detainee's own good. But the facility never engaged in the process it's required to engage with to determine whether he needed to be there. Let me stop you for just a second. So the purpose of the detention is not just for the detainee's own good. It's for the public's good as well, right? I mean, the determination is whether he's a danger to himself or others. Yes, Your Honor. It can be for either purpose, for his own good or for the good of others. But regardless, there were no specific findings on either point that he was a threat to himself or others, nor was the process which would determine that ever engaged in, which would be the emergency commitment process. So essentially, without any accusation of any criminal wrongdoing, Mr. Garrett gets caught up in this dragnet. He's brought to this facility where they seem to believe that just because he is brought there, that means that they can, without any formal process, any commitment process, keep him there. And that can't be so. Could I just ask, Ms. Levin, just breaking this down, we have the Denver police go to the home. They're not parties to the case, correct? Correct. And then the emergency service patrol comes to pick him up, takes him to the facility. And so I wanted to ask you just a question at that point, and that is, is the probable cause that the emergency service patrol needed to take Mr. Garrett and transport him different from the probable cause that the facility would need to detain him there? In other words, you've sued, I mean, one of the defendants was part of the emergency service patrol. I'm just wondering if we evaluate that person or the patrol's conduct differently from the way we evaluate the facility's decision making. Yes, Your Honor. You do evaluate them differently. Because it would, and I would say analogously to the way that you evaluate an officer's probable cause finding on a warrantless arrest versus the finding of probable cause by a magistrate. The facility, once this person is in the facility, and it is reasonably feasible to engage with the process that allows for a neutral decision maker to consider the probable cause, they're required to have that neutral decision maker get involved in order to approve or disapprove of the emergency commitment. And to look at the specific observations and decide whether or not those do justify a continued holding. And I should add to this, once they're at the facility, it's been enough time that it's reasonably feasible to get that review. And they are aware that the person does not consent. And I think that the easiest place to look to see that that's the case is the regulations. So at page 27 of Denver CARES brief, they cite to a set of regulations that control Denver CARES and its conduct. And number six is for discharge planning. And what that says is that they need to have a policy in place such that if somebody is receiving services on a voluntary basis, which purportedly is what was happening with Mr. Garrett, despite his clear statements that he did not want to be there. If somebody is receiving services on a voluntary basis, and they say that they want to go, and medical personnel doesn't think they should. What the regs say is, okay, then the facility has two options. Option one is to let them go. Open the doors. This is a treatment facility, not a jail. Let them go. Option two, if there is a reasonable basis to believe they're intoxicated and clearly dangerous, initiate the emergency commitment procedure. And I do think it's worth noting that the emergency commitment procedure, unlike, say, a Gerstein hearing, is a purposefully designed low barrier process. And what I mean by that is that I think the most instructive case is Carberry, which is a Colorado case, but it's a determination that's made soon after the statute was passed. And the question there was, with this emergency commitment statute, do we need a magistrate? If you want to hold somebody for being intoxicated, do you have to go get the magistrate out of bed? And what the Colorado court says is, no, this is supposed to be an alternative to that. But the Fourth Amendment process that's going to be provided, the equivalent of the Gerstein hearing, because these are necessarily going to be warrantless seizures, is that a neutral decision maker being an administrator at the facility, I'll represent Denver CARES has one there 24 hours a day, will approve applications so that somebody is going to sit down, write out what the specific instances of conduct, what are the statements made, the non-conclusory basis to believe that the person could be clearly dangerous, and then a neutral decision maker who is on hand at the facility 24 hours a day needs to look at that and either approve or not approve the emergency commitment, depending upon whether they believe there's probable cause to believe that there is intoxication and clear danger. Let me make sure I understand the argument. Are you saying that what Denver CARES needed was something akin to a magistrate to make the decision to keep Mr. Garrett there? Yes. And are you saying they don't have such a person doing that? Can't the intake people make that decision? They cannot because they're behavioral health techs and nurses, and the third party administrator for purposes under the statute, as I understand it, has a different position. But we are saying they do have that person there. But the way this place operates... They do have the person there. Who's that? I believe the head nurse is one of them. That's who we deposed. Did you make these arguments in your brief? Yes, Your Honor. Well, let me ask you this. They get Mr. Garrett to Denver CARES, and his blood alcohol level is 0.196. So why isn't that alone enough for a reasonable concern about dangerousness, at least to himself? Because that's a pretty high blood alcohol level. What's unreasonable about holding him, at least for some period of time, at that point? Your Honor, I think that there are people who at that BAC would be dangerous and folks that may not be. And that's a factual dispute as to whether or not that's clear danger and probably a factual dispute that involves not only additional information about Mr. Garrett, but perhaps even information from a professional in the field. I don't think that it's... I think it's beyond the purview of the court, as the trial court did, to step in and make that determination, which realistically is supposed to be made by somebody with experience and knowledge in the field. But beyond... Well, isn't that what the intake people are? I mean, they do have experience. They deal with this on a daily basis. They're making these decisions all the time. They're trained to make these decisions. And why would court second-guess the reasonableness of that? So I want to step back very quickly because I do have an answer to that. And I want to make sure that I've addressed an earlier question that feeds into this, which is the way that things work at this facility. The problem is that this facility, it has the administrator on hand. It has the time and the resources to do the emergency commitment it's supposed to do if somebody doesn't consent. But the way that it works is that when somebody comes in, and we allege in order to avoid having to actually make probable cause determinations on a case-by-case basis, what they do is they presume that everybody who comes in, no matter how they come in, volunteered to be there. Is consenting to the detention in the drunk tank. And because of that, the folks at intake, they're not tasked with documenting the sort of specific non-conclusory, you know, instances of conduct that would give rise to belief that somebody is dangerous rather than just intoxicated. And intoxication alone is not sufficient. It's simply not. These are disjunctive. Is it reasonable to let someone leave the facility who registers a .196, especially when there's at least some risk to the facility that if something bad happens after release, they could be liable? Your Honor, again, I think that's a factual dispute question, particularly because we've got allegations here that he had a sober ride. A friend who came to the facility to pick him up. And I would refer back to O'Connor where the courts. When did he have a sober ride? It wasn't at the point of intake. No, it certainly wasn't at the point of intake. So now you're moving on to whether they should have released him sooner. I think it's all one in the same to the extent that. Oh, well, is it? You just said there was a different standard for Mr. Paddock to take him into Denver Cares as opposed to intake. Why wouldn't the analysis be different as to whether the risk has dissipated and they should release him sometime later that night? Doesn't seem to me those decisions are the same decisions. Because the way that the trial court assessed this matter, the court essentially said that if the initial determination at the scene by officers and EMTs, if, you know, in the court's judgment, that was reasonable, that that probable cause carries through all the way through the 10 hour detention. Absent something that undermines the original initial detention. And we believe that's the wrong standard. At the point at which an assessment is made and it's determined he doesn't consent and he is safe to be free in society. And certainly if the court believes that that was not at intake, then I think that that, again, I would argue that's a factual question. But regardless, even if it's not, then there's certainly several points later in the evening when they were aware that he had a sober ride. They have a counselor looking at him, which is somebody that can do discharge or emergency commitment. And at no point did anybody provide the low barrier process they're supposed to so that he could at least dispute his detention. And that's a violation of the Fourth Amendment unto itself. If I may reserve my final minute. Let me ask you a question and then maybe Judge Mathison will indulge you with a little rebuttal. But my question, I'm trying to understand, is your argument ministerial in nature that they had certain processes that they had to do on intake and while he was there? And because they didn't do them, it doesn't really matter what the facts show. I mean, as far as what Judge Minico saw as the facts. So, Your Honor, and we're a little bit hamstrung by the underdeveloped record. Our argument is that. It's it's there is something ministerial in nature here to the extent that there was no, there was no Gerstein equivalent, despite clear allegations that that would have been reasonably feasible within the timeframe. And so on that, even on that basis alone, this couldn't have been compliant with the Fourth Amendment. In addition to that, our position is that the only way to get to the understanding of the case that Judge Domenico got to, there needs to be any number of inferences made against. The plaintiff and I will, because my time is up, I'm going to give 1 brief example, the phone call from the neighbor. Not only is it an anonymous tip, we don't know whether the call said that Mr Garrett was the perpetrator or the victim. You have to presume that it said he was the perpetrator. There's any number of inferences that had to be made against him in order to get to the point that the trial court did in terms of saying. This was reasonable, even without the. Quite frankly, low barrier. Gerstein equivalent process. Thank you counsel. We'll, we'll, we'll see whether. We'll come back to you later. Mr. Hood. Good morning, your honors on behalf of Denver cares and the individual. I have a number of points that I want to address that Miss Levine raised, but I just want to kind of frame the analysis here. 1st, I mean, this, this case involves. 2 questions, the 1st question is, was there a probable cause to detain Mr Garrett? And then the 2nd question is whether his detention was reasonable under the circumstances. And if we go to the 1st question, the 1st question is analyzed under traditional probable cause. Analysis based on well, settled precedent. In this case, the police came to Mr Garrett's front yard. Where a neighbor had reported that he was having an altercation. With someone else, they seized him and put him in the back of their squad car. And then they called from Denver cares to come and take him for detox. When got there, they observed the following. He was verbally aggressive. He was cursing. He had a strong odor of alcohol. Slurred speech. A staggered gate, and he admitted to alcohol use. And then when he was taken by to Denver cares, he blew a 0.196. Okay, Mr. could I just stop there for briefly?  And when went to the scene. As I understand it, the complaint does allege. As you described, but is there anything in the complaint to indicate whether the police told ESP about the altercation? There is it, but. From the perspective of ESP, they're receiving someone from the police who's handcuffed in the back of a squad car. And the police are asking ESP to take this person in for detox. So, from the perspective of ESP, it would have been reasonable for them to determine that this person. There was a basis to take this person into detention for detox. They didn't have to have a discussion with the police about what happened. It could have been that they did have a discussion with the police, but that's not alleged in the complaint. But from the perspective of the folks on the scene who are observing Mr. Garrett's behavior, that's what they observed. And your honor, I want to address a question that you asked earlier about when is probable cause assessed. Probable cause is assessed from the perspective of the seizing official. And in this case, that was the police. Mr. Garrett never was unseized. He was seized by the police. He was handed off in a chain of custody between the police, ESP, and then brought to CARES. So, the question, and this is what Judge Domenico analyzed. He said, based on the facts, the totality of circumstances that we know, based on the allegations in the complaint, and the documents that are cited in the complaint, was there probable cause to seize him for intoxication? And if you look at the totality of facts, including what the police would have observed from Mr. Garrett when they got on the scene, the fact that they had a call from a neighbor who was concerned about a fight on his front yard, his condition when ESP arrived there, and the notes in their logs, and then his very high level of intoxication when he got to Denver CARES, based on the totality of those facts, there was probable cause to detain him. And I would just remind the court that the probable cause standard is not a high bar. It is a question of probability. It is not a beyond a reasonable doubt standard. It's not even more likely than not standard. It is a probability standard. And based on those alleged facts. Mr. Hood, once they get him to the facility, though, and at intake a fresh assessment is made, they take the blood alcohol, they do observation, and so forth, doesn't that require at that stage its own probable cause determination? It does not. Why not? It does not. Why not? There are two problems with that. One is that this court has repeatedly stated that when you have a chain of custody of someone who's been seized, that there's no obligation to reassess probable cause at each chain of that custody. It's reasonable for individuals along the way to reasonably rely on the determination of those. But what if he had come in and the blood alcohol was 0.01, and he was perfectly calm, non-aggressive, and all the rest, and they say, that's too bad, we're going to keep you here. And it seems to me what you're saying is doesn't matter. Once you got probable cause, that's it. No. They can do whatever they want. That's not what I'm saying, and I appreciate the question. I'm saying, why wouldn't we look at probable cause at the point of intake? Because when probable cause has been established to seize somebody, the question then becomes, is there observed evidence that would dissipate the probable cause? Well, okay, what difference does that make? I mean, isn't it just two sides of the same coin? Either you still have probable cause or you don't have probable cause. The people that are doing intake are not assessing for probable cause. They're walking through a clinical process to establish the care and needs this person has based on their condition in detox. And part of that is getting the person's blood alcohol level. Part of that is taking their vitals. And part of that is creating a care plan for when they're in the facility for detox. The folks that are at the initial intake process are not reassessing probable cause. That's not what they're trained to do. That's not what they're legally required to do. But counsel, they're making a detention decision. They could cut this guy loose right then and there. So they are making a detention choice. So isn't there still some reasonableness standard that has to come into play at that point? No, I would agree with you, Your Honor, that they cannot unreasonably detain somebody. There's always a reasonableness standard that applies. But it's not the question that the intake folks are asking is not is there probable cause. They're gathering facts to help create a care plan for somebody that's there for treatment. They're not asking what the police did, which is is there probable cause to seize this person for intoxication. Now, they can't ignore facts that would dissipate or render the initial probable cause determination unfounded. So if he got there and he had no alcohol in his system at all and he had been brought in there for alleged detox, that would be a fact that they would need to consider under the reasonableness framework. They can't just ignore that fact. There may be, however, some other attendant facts that the person comes in with in terms of their medical condition that they can't ignore either. That might actually support keeping them for treatment. I mean, they're making the same determination. I mean, the determination is the same no matter what label you put on it, whether whether he's a danger to himself and others. The police, when they when they cuff him and stick him in the car, but, you know, not for criminal purposes. They're making a decision there that he's intoxicated and a danger to himself and others. And then they pass him off to the emergency service officer. And then he arrives at Denver Cares and they're they're assessing him to decide if he's a danger to himself or others. So whether you want to call it probable cause or not probable cause, they're all making the same determination. I disagree that the there are the folks at Denver Cares at intake, nor the ESP folks who received him from the police are necessarily asking themselves, is this person a danger to themselves or others? Because the initial we ask at the initial seizure point, was there evidence to show this person was intoxicated and a danger to themselves or others? That's an observation made in the field that can't be replicated at Denver Cares. So when he gets to the intake process, the folks who are taking his vitals and taking his BAL cannot properly assess whether he's dangerous, as observed by the police in the field. So it's not fair to him, nor is it reasonable to impose that burden on the intake folks at Denver Cares. Well, let me let me ask you a question. Hypothetically, he shows up, the police, the police thought he was a drunk, the police put him in the car, the police sent him with the emergency service officer, and he comes in, as Judge Matheson posed to you earlier, he's compliant, he's polite, and he blows virtually nothing. Could they keep him just because the police thought he was a danger to himself or others? The fact that he was brought in, all of those facts would need to be taken into consideration to determine whether it was reasonable to keep him. And it's I can't tell you sitting here today based on the hypothetical whether they could, because those aren't the facts before us, and we would have to take all of that into account to determine whether he should be detained. So your point is that, in my hypothetical, where you have someone who's just a regular guy off the street, no indication that there's any problem whatsoever, that we don't know if they can keep him or not, maybe they could. Based on the facts present that are present at the time, yes, they would have to determine whether he is a candidate for detox. If he's brought in by police, however, and the police send him to Denver Cares under protective custody, then that's a fact that needs to be considered as well. But that gets to the traditional Fourth Amendment analysis of when a receiving officer is taking somebody who's already been seized and the receiving officer observes something about the suspect that doesn't match what the report is on that person, then, of course, they can't ignore those facts. But that's part of the dissipation analysis is the original probable cause unfounded. Counsel, does the complaint allege that the intake people were aware of the altercation back at the home? It does not. And what do we do with that? Do we impute that knowledge or not to the intake people? So it's the same thing as so like a booking sergeant at a jail doesn't necessarily know what the seizing officer knew in the field. The seizing officer sees the basis in the field to seize, and then that person is through a chain of custody brought where he needs to go. A booking officer isn't that that that doesn't seem like a very good analogy to the intake people who are making up whether you want to call it a probable causes assessment or some kind of professional medical behavioral assessment. They're making a new assessment. Here's what the intake people would have known. Judge Matheson is that ESP. It's whatever the complaint allege, right? Aren't we? We are at the pleading stage, right? And what I was about to say is what was alleged and what's in the documents alleged in the complaint. What we know from what's alleged is that the intake people would have known what ESP put in their documentation. And ESP was very clear that they received Mr. Garrett from the police who requested he be taken in for detox. They would have known that they wouldn't have known about the altercation that led to the initial seizure. Again, that's my point about the folks who are in this chain of custody cannot be required to reassess the initial probable cause determination that is made in the field by the officers who are there on the scene. What's your best? What's your best case that would apply to this situation? That holds that the Baptiste case. The Stearns case. The Hinkle case, all of which are cited in the briefing. Those are clear that officers or authorities in a chain of custody do not have to reevaluate or reassess probable cause. Well, one of the claims here is, okay, we had ESP pick him up. We had intake keep him there. But then part of the claim is they kept him there too long. Right. Yeah. So how does your argument about probable cause sort of carrying through this whole episode apply to the point where we get to 1130 at night? The staffs talk to him. He has a ride home. The counselors talk to him and the plaintiffs are alleging and arguing that at that point they should have cut him loose. Is that a probable cause determination? What is it? No. What if they're right? What if the, maybe you disagree that the allegations support that, but let's say they're a little stronger. That is, maybe they take another blood alcohol and there's nothing there. He's completely sobered up. His friend's there to give him a ride and they say, no, we're going to keep you for another six hours. Why wouldn't they have a good claim at that point that his Fourth Amendment rights were violated? Well, I'll just say that's not the allegations here. I didn't ask that, counsel. I'm asking you, would they have a stronger case? And if they did, is it a Fourth Amendment case? I know it's not. That's why it's a hypothetical. But I'm asking you to address the hypothetical. Sure. So to answer your first question, the analysis is different. It's a reasonable under the circumstances analysis when the detention is happening. It's not whether there's probable cause to seize. He's already been seized. The question then becomes whether the seizure itself, the detention itself is reasonable under the circumstances. And under your hypothetical, we would have to analyze whether the facts observed as alleged in that circumstance rendered his continued detention unreasonable.  And I would say. So as opposed to whether they have probable cause, you're saying that's not the question. The question is whether continued detention is reasonable. Correct. And you look to cases like Garner where there is an analysis of prolonged detention. The standard is really it's again, it's a reasonableness standard. And you look at whether the detention itself is tailored to the purpose underlying the detention. And here you have someone who was brought in for being highly intoxicated and dangerous. He was held to about the point that he was sober. He was treated for alcohol withdrawal symptoms along the way. And he went home early the next morning. We, our position is that that is a reasonable detention under the circumstances. I think I'm following you a little better at this point. I guess to do some things up, you're over time, but I probably ought to give you a chance to make one more point if you've got one. Yeah, I would just point to our brief where we distinguish between protective custody and the emergency commitment process. Counsel for Mr. Garrett is trying to impute the emergency commitment process on the protective custody standards. And that's just different. A person who is an administrator of the facility can make an emergency commitment on the scene. And that has to be based on intoxication and dangerousness. But that is not the same as the police or ESP bringing someone in for protective custody for what they observe in the field. And I would also point out that the Gerstein hearing she's talking about, there's no requirement that a facility like Denver CARES has to have a magistrate-like hearing immediately when someone gets there. The statute actually provides for notification of the right to challenge the seizure in voluntary detention and the right to a lawyer within 24 hours of the detention. So under the facts alleged here, that process never should have been or needed to be invoked. But that process is built into the statute. Okay. Thank you, Mr. Hood. If we're going to go with the equal time principle, I'm going to give Ms. Levin maybe one minute. Thank you. Thank you. Thank you, Your Honor. And I will try and sum things up and address things. First of all, I would ask the court, in terms of the hypothetical it was discussing, to look at 2023 Westlaw 9235311. That is the summary judgment order in the prior Midget case. And frankly, the court was essentially describing Mr. Stecker, one of the plaintiffs who was held and who did obtain a jury verdict based upon the unreasonableness of the holding. Second, and I think that this comes down to them saying this is all protective custody. Ultimately, what they're asking for is the ability to hold people who there's no claim have done something criminal with no safeguards whatsoever. Despite the fact that there is this very low barrier safeguard available. And that's a huge problem because this is where criminal law and behavioral health get very different. This is not supposed to be a punishment. The idea that they don't have to reassess somebody when they show up at what's part of a hospital in order to that they that that portion of the hospital doesn't need to reassess what a police officer did earlier. This isn't supposed to be a punishment for prior conduct. They're supposed to be held so long as they are dangerous. With that, thank you. Thank you. Thank you to both of you. It was really an interesting argument and a helpful one to us. So thank you again. The case will be submitted and counselor excused.